55 N.J. Super. 122 (1959)
150 A.2d 50
S.C. WILLIAM ACKERMAN, T/A ACKERMAN & COMPANY, PLAINTIFF-APPELLANT,
v.
ISRAEL CITRON, DEFENDANT-RESPONDENT AND THIRD-PARTY PLAINTIFF, AND ANTHONY J. LARRECQ, DEFENDANT-RESPONDENT AND THIRD-PARTY DEFENDANT, AND POWER GENERATORS, INC., A CAL. CORP., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1959.
Decided April 2, 1959.
*124 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Charles Sabin argued the cause for plaintiff-appellant (Messrs. Katzenbach, Gildea and Rudner, attorneys).
Mr. Richard J.S. Barlow, Jr. argued the cause for defendant-respondent Israel Citron (Messrs. Lenox, Giordano and Lenox, attorneys).
Mr. Mark D. Kaplan argued the cause for defendants-respondents Anthony J. Larrecq and Power Generators, Inc. (Mr. J. Conner French, attorney).
The opinion of the court was delivered by CONFORD, J.A.D.
This is an action by a real estate broker to recover commissions in connection with a later sale of certain property to the principal stockholder and officer of a corporate lessee of the property procured by the broker. Plaintiff appeals from a judgment of involuntary dismissal entered by the Superior Court, Law Division, at the end of the presentation of the plaintiff's case.
*125 The defendant Citron was a subsequent grantee of the original owner of the property with whom the lease and commission agreement had been entered into. The status of the other parties will appear from the following statement of the facts.
On November 1, 1951 one James A. Murray, the then owner of the premises in question, leased a portion thereof to Power Generators, Inc. (hereinafter "PGI"), a California corporation. Plaintiff, a licensed real estate broker, had obtained the tenant and negotiated the lease. Paragraph 11 of the lease declared that Murray recognized plaintiff as the broker on the lease and agreed to pay him 5% of the annual rent so long as the lease or its extensions remained in effect. The lease also provides for payment to plaintiff of 5% of the selling price of the premises if they are purchased by the tenant, "its successors or assigns, or anyone acting on its behalf."
On July 15, 1955 Murray sold the premises to the defendant Citron, who was in no way connected with the defendant corporation. PGI was still a tenant. Before purchasing the property, Citron insisted that the lease with PGI be renewed, and this was done.
Some time in July 1956 Citron and his tenant, PGI, which was still in possession under a lease extension, began negotiating for the sale of the premises to the latter at a price of $70,000. However, PGI had borrowed heavily from the Trenton Trust Company, and by agreement with the bank dated April 2, 1954, had obligated itself, among other fiscal restrictions, to secure the approval of the bank as well as of the Federal Reserve Bank of Philadelphia before spending more than $10,000 for capital improvements.
In a letter dated July 17, 1956 to the Trenton Trust Company seeking permission for PGI to buy the property, Anthony Larrecq, the corporation's president, explained why its purchase of the entirety of the premises in which it was situated would be a wise move. That part of the premises not then used by PGI was suitable for contemplated expansion of the company's manufacturing business. *126 The rent of $15,000 per year then being paid would exceed the $70,000 cost of the property within five years. Rental of the basement to the warehouse company then in occupancy thereof would cover tax and maintenance expenses. Larrecq went on to explain the corporation's cash status and anticipated increases therein, and suggested that the purchase would protect the company's capital position without embarrassing its cash position, would give it greater financial flexibility, and after five years would result in a large annual saving.
Both banks, however, felt that the purchase would too greatly attenuate PGI's cash reserves, and they refused to approve the sale. Mr. Rice of the Trenton Trust Company then suggested to Larrecq that he personally buy the building and stated that the bank would give him the required mortgage loan. Rice suggested that at the proposed selling price it would be a good investment for Larrecq. He noted that PGI had made improvements to the building, built a parking lot and made alterations, and that the building contained room for the corporation to expand. He also commented to Larrecq about possible adverse effects to the corporation should the building pass into adverse hands.
Shortly thereafter, Larrecq, who directly or indirectly owned 87.6% of PGI stock and was its principal executive officer, did purchase the property in his own name. On August 3, 1956 he borrowed $5,000 from the corporation for a down payment, and, in September 1956, an additional $10,000 for closing fees, etc. He paid 4 1/2% interest on these advances and had by the time of trial fully repaid the loans. To facilitate repayment of the loan PGI increased Larrecq's salary from $20,000 to $25,000. The necessary consent of the Federal Reserve Bank for this step was granted on certain conditions, including:
"1. The net amount of the increase after taxes is used to repay the $5,000 advanced to him.
2. That there shall be no increase in the rental of about $14,000 per annum currently being paid for the building operated by the Borrower."
*127 Thus it is quite clear that although, strictly speaking, Larrecq repaid the $5,000 loan from his own account, he did it with money supplied him by PGI, labeled "salary," but designed to accomplish the repayment.
When a new lease between Larrecq and the corporation became effective in October 1956, the tenant paid its president three months rent in advance, as well as $5,000 by way of security, which was to be held by the owner and credited to the final installment of rent. There had been no such provision in the prior leases with Murray or Citron. To obtain Federal Reserve Bank approval of the terms of the lease, PGI and Larrecq agreed to reduce the latter's salary, as of January 1957, to $19,000.
Plaintiff's present action against Citron is to recover commissions on account of the sale pursuant to the original lease between Murray and PGI on the theory that the lessee was, in effect, the purchaser; or, in the alternative, that Larrecq had purchased the property acting on behalf of the lessee. A second count, since abandoned, charged Citron, Larrecq and PGI with tortious interference with plaintiff's rights as a broker. Citron filed a third-party complaint against Larrecq seeking restitution to the extent of any judgment against him in favor of plaintiff, claiming false representations by Larrecq that he was purchasing the property in his own behalf and not on behalf of PGI.
On motions at the end of the plaintiff's case the trial court, sitting with a jury, dismissed both the complaint and the third-party complaint. The determination was apparently (the trial court's reasoning is not given in the appendices) to the effect that as a matter of law the written agreement did not support any right of commissions on the facts established.
The first contention advanced by plaintiff is that in substance the purchaser from Citron was PGI, the arrangement for Larrecq to take title being only a formality necessary to meet circumstances extrinsic to the intent of the contract for commissions. Plaintiff argues this is a situation calling for "piercing the corporate veil" to accomplish *128 justice. We think not. This was not a case of attempted fraud of plaintiff's rights by manipulation of entities. There was no indication that Citron was instrumental in any way in the decision that title be taken by Larrecq rather than by PGI. This eventuality was the product solely of the exercise by the banks of their veto over a purchase by the corporation. Insofar as plaintiff's interests were concerned, the arrangements in connection with the sale were effected in complete good faith.
Private decisions concerning the conduct of business or personal affairs with or without the use of corporations in order to obtain such lawful advantages as inhere in the employment of one kind of legal entity rather than another cannot be overruled by the courts in the absence of fraud or other manipulation to defeat the ends of justice. Frank v. Frank's, Inc., 9 N.J. 218, 223, 224 (1952). Compare Macfadden v. Macfadden, 46 N.J. Super. 242 (Ch. Div. 1957), affirmed 49 N.J. Super. 356 (App. Div. 1958), cert. den. 27 N.J. 155 (1958); Telis v. Telis, 132 N.J. Eq. 25 (E. & A. 1942). We discern no justification here for treating the sale to Larrecq as the equivalent of a sale to PGI within the meaning of the contract with plaintiff.
But the foregoing conclusion does not dispose of the matter of liability for commissions to plaintiff. Under the lease, commissions were payable to plaintiff if the property were purchased by "anyone acting on its (i.e., PGI's) behalf." Plaintiff argues that Larrecq was, in fact, regardless of surface arrangements, purchasing "on behalf" of PGI in that the motivation for the purchase was to make secure the availability of the premises for PGI's business requirements, present and prospective, rather than as a personal investment of Larrecq. As to this, there is apparent to us an obvious ambiguity in the contractual language in relation to the particular factual contingency here presented which, on the facts adduced before the dismissal was granted, could be argued either way. On the one hand it might be said that "on behalf of" meant as trustee or agent of; i.e., as a purchaser taking title solely in a representational status, *129 and in behalf of another, the latter being the real party in interest. In this sense, Larrecq could not under the proofs be regarded as purchasing on behalf of PGI. But it might be argued, on the other hand, that the contractual language intended to comprehend the case where the purchaser was taking title under the primary motivation of making the property available for another. If this was in fact the case here with Larrecq, acceptance of that construction would lead to a recovery by plaintiff.
Ordinarily the construction of a written agreement is a matter for the court, but where its meaning is uncertain or ambiguous and depends upon evidence of disputed extrinsic circumstances admitted in aid of interpretation, the meaning of the doubtful provisions should be left to the jury. Michaels v. Brookchester, Inc., 26 N.J. 379, 387 (1958); and consult 3 Corbin on Contracts (1951), § 554, pp. 119-124; 3 Williston on Contracts (rev. ed. 1936), § 616, p. 1772.
In the present case the conditions attending the decision to have Larrecq rather than PGI buy the property were fully developed at the trial, but these do not relate to the circumstances surrounding the making of the agreement, from which one might seek guidance as to the intent of the original contracting parties. The later circumstances mentioned only point up the dispute of construction; they do not illuminate the intent of the contracting parties in agreeing upon the language in the writing. Nor was there any significant factual dispute with respect to them. They therefore would not present factual issues the determination of which by a jury would logically aid in a determination as to the disputed interpretation. Thus, on the basis of the record as it stood at the end of the plaintiff's case, the issue of construction remained one for the court, rather than for the jury.
But plaintiff argues it did attempt to offer evidence of circumstances surrounding the original lease and that the court excluded it. We are of the opinion, however, that there was no prejudicial error in the rulings, nor anything *130 which might suggest that the issue of construction would become one for the jury under the cited authorities if the court had received such proofs. Plaintiff's counsel was afforded the opportunity to state what he wanted to establish by the proposed testimony concerning conversations between Murray, Ackerman and Larrecq. So far as we can discern from the record, the substance of what he desired to develop had no bearing on the present dispute unless the intent was to offer testimony of an explicit oral agreement or understanding by the parties, supplementing or explaining the lease, to the effect that a sale to an officer or stockholder of PGI would create a liability for commissions. Any such testimony would be in plain violation of the parol evidence rule. Newark Publishers' Ass'n. v. Newark Typographical Union, 22 N.J. 419, 428 (1956); Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 303, 304 (1953); Meola v. Gorga, 27 N.J. Super. 390, 395 (App. Div. 1953); and see Loria's Garage, Inc., v. Smith, 49 N.J. Super. 242 (App. Div. 1958). Consider, moreover, that Citron, the party now sought to be held, had nothing to do with the original negotiations. Cf. American Rieter Co. v. Dinallo, 53 N.J. Super. 388, 394 (App. Div. 1959).
Thus returning to the judicial problem of construction of the contractual language (confined necessarily to the existing posture of the proofs as of the end of plaintiff's case), we conclude that the intent of the parties, in the light of their written expressions, was that if an officer or stockholder of the lessee purchased the property primarily motivated by considerations of service of the business needs of the corporate lessee, rather than as a personal investment, the purchase should be regarded as having been effected on behalf of the lessee within the meaning of the agreement. This, we think, accords with the general spirit of the commission arrangement to reward the plaintiff for the ultimately consequential as well as the immediate results of his brokerage efforts. The dismissal in the trial court having been based upon a determination that the contract precluded recovery in the present circumstances as a matter *131 of law, it must be reversed. Our construction of the agreement raises a factual issue concerning the primary motivation for the purchase by Larrecq. That issue will have to be resolved at a new trial.
A good part of Citron's brief is devoted to the argument that he is not liable in any event as he was not a party to the original agreement. This position does not lie in his mouth upon this appeal. He did not raise the issue in his pleadings, in the pretrial order or at the trial. In fact, he practically conceded the contrary at the trial. He therefore cannot, under settled principles, make the contention for the first time on appeal. Domestic Fuel Co. v. American Petroleum Co., 6 N.J. 538 (1951). We note, moreover, Citron's express insistence on Murray's securing an extension of the PGI lease as a condition for his purchase of the property.
If plaintiff earned his commission on the sale, it must be due from either Citron or Murray, or both. Citron has not argued it is owing by Murray rather than by him.
The present reversal of the judgment rendered below in favor of Citron will not affect the judgment of dismissal of the third-party claim, as Citron did not appeal from it. Korff v. G and G Corp., 21 N.J. 558 (1956).
Reversed and remanded for a new trial.